to the negroes replevied. How this replevin was disposed of after the return court, does not appear; at that court, the testimony is, that *Forrest* undertook the defence of it, made a motion for a return of property; and then abandoned the case, and that *Fenwick* did not at that term appear to the action. Whether at any future time he became a party to it is no where stated, neither does it appear that the title to the negroes was ever tried on this replevin. If *Sommerville* had made good his claim to the negroes thus replevied, the judgment would have afforded the best evidence, to which the plaintiff in this suit could resort, to prove that he (*Sommerville,*) had a better title to them than *Fenwick*; it would have been the establishment of his right by process of law. But this is not the only testimony the plaintiff in this action might have used to sustain his allegation, that at the time of the sale of the negroes in dispute to him by *Fenwick,* they were the property of *Sommerville.* This material proposition he might have substantiated by any other evidence, written or oral, evincing the fact, and thus have maintained his action of covenant against the defendant. Evidence of either kind, to prove *Sommerville's* right to the disputed negroes, he failed, however, to produce on the trial, and therefore we think the court below ought to have given the directions to the jury prayed for by the defendant.

We reverse the judgment, and order a *procedendo* to issue.

JUDGMENT REVERSED, &c.

JUNE 1822.

Patterson
vs
Insurance Comp'y

---

## COURT OF APPEALS, JUNE TERM, 1822.

PATTERSON *vs.* THE MARINE INSURANCE COMPANY.

THE SAME *vs.* THE BALTIMORE INSURANCE COMPANY.

APPEALS from *Baltimore* county court. They were both of them actions of *covenant* on policies of insurance, brought by the appellant against the appellees. One of the policies was on the ship *Edward,* and the other on her cargo. By each of the policies, which was on a voyage from *Baltimore* to *Lisbon,* it was stipulated, touching the adventures and perils which the assurers were content to

Under a policy of insurance, in the usual form, made during the last war between *Great Britain* and the *United States,* the vessel insured proceeded on her voyage and was stopped by the enemy's squadron supporting the blockade of the *Chesapeake* bay, and sent back to

port—*Held* not to be an arrest and detention by princes, &c. nor a capture by enemies within the policy.

June 1822.

Patterson
vs
Insurance Comp'y

bear and take upon themselves in the voyage; "are of the seas, men of war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and counter mart, surprisals, takings at sea, *unlawful (a)* arrests, restraints and detainments of all kings, princes or people, of what nation, condition or quality soever, barratry;" &c.

The declaration in each case contained two counts, each setting out the policy of insurance. The *first count* assigned as a breach of the covenant, "that while in the lawful and regular prosecution of her voyage, and before her arrival at *Lisbon* aforesaid, the said ship was, on the high seas, by force and arms arrested, restrained and detained, by certain ships of war, acting under the authority of the King of *Great Britain*; by reason whereof the said *ship* became wholly lost to the plaintiff, of all which the defendant afterwards, &c. had notice:" &c.

The *second count* assigned as a breach of the covenant, "that while in the lawful and regular prosecution of the said voyage, and before her arrival at *Lisbon* aforesaid, the said ship was by force and arms, on the high seas, and in a hostile manner, attacked, conquered, taken and carried away, a prize, by certain enemies of the *United States* of *America*, subjects of the King of *Great Britain*, then at war with the *United States* of *America*. Of all which the defendants afterwards, &c. had notice," &c. The defendants pleaded *non infregit conventionem*, and issue was joined.

The plaintiff, at each of the trials, read in evidence the policy of insurance mentioned in the declaration in each case, sealed with the common seal of the defendants, and signed by their secretary, on the 9th of January 1813. By the evidence offered by the plaintiff it appears, that he was, when he caused the insurances to be made, an *American* citizen, residing in *Baltimore*, carrying on trade and commerce, and was the sole owner of the ship and cargo insured, and that both ship and cargo were *American* property; and regularly documented as such, and lying in the port of *Baltimore*. The ship sailed from *Baltimore* on or about the 9th of January 1813, and proceeded on her voyage until the 15th of February 1813, when in the *Chesapeake* Bay, near to *Cape Henry*, she was boarded by several boats from a *British* squadron of ships of war, then lying

(a) The word *unlawful* was omitted in the policy on the goods.

at anchor in *Lynhaven* Bay, near the mouth of the *Chesa-*

*peake.* The master of the ship was ordered, by an officer of the squadron on board of the boats, to come to with the ship, and go with his papers on board of the commodore of the squadron, which order ' he obeyed. He and the ship were forcibly detained by the squadron till the day following, when he received from the commander of the squadron, then supporting the blockade of the *Chesapeake,* the following order: "In pursuance of orders from the right honourable Sir *John Borlase Warren,* K. B. &c. to place the ports of the *Chesapeake* in a state of strict and rigorous blockade, you are therefore hereby directed to quit this anchorage immediately, and proceed to the port from whence you came. Should you be found violating this order, you will be seized and sent in for adjudication." On the receipt of this order, the master immediately returned with ship and cargo to *Baltimore,* where he arrived with them in good order and condition, on the 26th of February 1813. On the same day the plaintiff having received information of the above facts, abandoned both ship and cargo to the defendants in due and reasonable time, which they refused to accept. In the course of ten days, after giving notice to the defendants of his intention to do so, and asking their direction as to the disposition of the vessel and cargo, (which they declined giving,) the plaintiff broke up the voyage, and sold both vessel and cargo to the best advantage, for the benefit of those concerned. To this sale the defendants consented, without prejudice to their right of contesting the plaintiff's right to abandon, &c. At the time of making the policies, of the sailing of the ship, of her detention and return to port, and of the abandonment, open war existed between the *United States* and the King of the *United Kingdom* of *Great Britain* and *Ireland;* and that the said squadron, at all said times, was a part of the naval force of said King, employed in carrying on the war; and for the purpose of prosecuting the war, arrived and took its station at the mouth of the *Chesapeake* on the 4th of February 1813, and remained there, or in, the waters of said bay, for said purpose, until and after the abandonment above mentioned. Before the 4th of February 1813, there was no enemy force regularly stationed at or in the mouth of the *Chesapeake,* or in its waters; but the ships of war, and squadrons of the enemy, did during

the whole time from making the policies and for some weeks before, until the 4th of February 1813, cruise along the coast of the *United States*, and pass and repass the mouth of the *Chesapeake*, and from time to time enter the same. The ship *Edward* was of the burthen of 300 tons; and although, while said squadron remained in the *Chesapeake*, some small *American* vessels got to sea, no *American* ship of the size of the *Edward* could do so without extreme danger of capture; and none of that size did, during that time, proceed to sea from the *Chesapeake*, except two, one of which got out on the 4th of February 1813, and the other on the day following. Many other such ships were captured by the squadron during the period last mentioned in the attempt to get to sea from the *Chesapeake*, some of which, having *British* licenses, were released by the *British* admiralty courts. On these facts the plaintiff prayed the opinion of the court, and their direction to the jury, that if they believed said facts, he was entitled to recover. The court, [*Dorsey*, Ch. J. *Hanson* and *Ward*, A. J.] refused to give the direction, and the plaintiff excepted; and the verdict and judgment in each action being against him, he appealed to this court.

The causes were argued before CHASE, Ch. J. BUCHANAN, EARLE, MARTIN, and STEPHEN, J.

*Taney,* for the appellant—1. The contract of insurance is a contract of indemnity, and stipulates in substance that the thing insured shall not be prevented, by any of the perils insured against, from proceeding on and performing the voyage insured.

2. "The detention of princes," &c. being one of the perils insured against, the act of the *British* squadron supporting the blockade of the *Chesapeake*, was such a detention, and constituted a total loss under the first count in the declaration.

3. As one of the perils insured against was the acts of enemies, the acts of the *British* squadron constituted a total loss under the second count in the declaration.

4. The first count in the declaration is good as a count for a loss by "enemies," one of the perils insured against in the policy; inasmuch as that count alleges a restraint by an enemy, and a loss by such restraint. The restraint is alleged to have been by a *British* force; and the court must

take notice, that the *British* were then enemies, because the war was declared by an act of congress, and could not be terminated except by a treaty; of both which the court is bound to take notice.

The declaration assigns two breaches, 1st. Arrest, restraint and detention of princes, &c. 2d. A capture by enemies. On the *first breach* he insisted that the restraint broke up the voyage; that it was one of the perils insured against in the policy, which was general against the restraints of all powers, and was not confined to the enemy; that such restraint continued after the return of the vessel into port, so as to justify the abandonment, and that the plaintiff's right to recover was on the loss sustained. He cited *Olivera vs. The Union Insurance Company,* 3 *Wheat.* 183. *Odlin vs. The Insurance Company of Pennsylvania,* 2 *Hall's L. J.* 205. *M'Bride vs. Marine Insurance Company,* 5 *Johns. Rep.* 307. *King vs. The Delaware Insurance Company,* 6 *Cranch,* 71. And *M'Call vs. The Marine Insurance Company,* 3 *Cranch,* 59.

On the *second breach* he insisted, that the capture was by the enemy, and that the voyage was broken up by the capture, one of the perils enumerated in the policy. The operation of the capture continued at the time of the abandonment. He cited *Olivera vs. The Union Insurance Company,* 3 *Wheat.* 183. 2 *Marsh.* 567, 568. *Goss vs. Withers,* 2 *Burr.* 696. *Rhinelander vs. The Insurance Company of Pennsylvania.* 4 *Cranch,* 29. The stoppage and detention of the vessel for a day amounted to capture, and was a technical total loss.

*Wirt,* (Attorney General *U. S.*) for the appellees, contended, that as the vessel was stopped by the enemy's blockading squadron, and sent back in good order, there was no more right to abandon than there would have been had she never sailed. Under the *first* count in the declaration, which charged the loss by restraint of princes, he insisted that the blockade was not such a restraint within the meaning of the policy. The enemy did not arrest, restrain and detain, but captured as prize. When a sovereign, not at war with the country to which a ship belongs, from motives of necessity arrests her ship, that was a detention of princes. Arrests are the acts of a friend, not those of an enemy. 2 *Marsh.* 506, 507, 514. Capture is

always made with a view to prize, but arrest with a view to restoration. He cited *Hadkinson vs. Robinson*, 3 *Bos. & Pull.* 388. *Lubbock vs. Rowcroft*, 5 *Esp. Rep.* 50. *Blackehagen vs. The London Assurance Company*, 1 *Campb.* 454. 6 *Rob. Adm. Rep.* 177. *Abbott*, *(Storey's Ed.)* 406. *Parkin vs. Tunno*, 11 *East*, 22. *Park*, 618, and *Parkin vs. Tunno*, 2 *Campb.* 59. The restraint was not an *unlawful* restraint within the words of the policy on the ship. A blockade is not an unlawful restraint. *Brewer vs. The Union Insurance Company*, 12 *Mass. Rep.* 170. *M'Call vs. The Marine Insurance Company*, 8 *Cranch*, 59. And *Olivera vs. The Union Insurance Company*, 3 *Wheat.* 183. Restraints are of two kinds, one actual and the other potential. Actual restraint is an actual possession and holding—in other words, capture. Potential restraint is through fear, &c. An embargo restrains, but does not take possession. A blockade, which keeps a neutral in port, is a potential restraint. No instance can be cited in which a potential restraint has been held to give a right to abandon and to claim for a total loss. If the vessel might be considered as restrained within the meaning of the policy, the owner had no right to abandon when he did, as the cargo had not been injured. In this case the restraint is to be considered as a temporary restraint. *Hadley vs. Clarke*, 8 *T. R.* 259. *Abbott*, 409. *Blackehagen vs. The London Assurance Company*, 1 *Camp.* 454. *Park*, 226. *Parkin vs. Tunno*, 2 *Campb.* 59. and *Smith vs. The Universal Insurance Company*, 6 *Wheat.* 184. The declaration must bring the case within one of the perils insured against in the policy. *Park*, 538. The peril insured was against *unlawful* arrests, &c. and the averment in the declaration does not say the arrest, &c. was unlawful.

On the *second count*, he contended, that the *allegata* and *probata* did not agree; the proof was not that the vessel was "attacked, conquered, taken, and carried away a prize," by the enemy, as averred in this count, but it was that she was stopped as violating the blockade, and ordered to return to port. To constitute it a capture, it was essential that the arrest should have been made with an intention of making the vessel a prize. 2 *Marsh.* 506. The assured could not abandon after the risk was over. *Hamilton vs. Mendes*, 2 *Burr.* 1198. 1 *W. Blk. Rep.* 276, S. C. *Park*,

265. The loss must be by some one of the perils mention-ed in the policy, and that peril must be the one stated in the declaration, or the assured cannot recover. Two distinct breaches of the policy cannot be connected in one count. *Hadkinson vs. Robinson*, 3 *Bos. & Pull.* 388. *Park*, 225, 548. And *Kulen Kemp vs. Vigne*, 1 *T. R.* 304. The exercise of force by a blockading squadron is no where termed a capture, *M·Call vs. The Marine Insurance Company*, 8 *Cranch*, 59.

*Harper* argued for the appellant in reply.

JUDGMENTS AFFIRMED.

JUNE 1822.

Merryman
vs
The State

---

## COURT OF APPEALS, JUNE TERM, 1822.

MERRYMAN, *et al. vs.* THE STATE at the inst. of HARRIS;

### use of MURRAY.

APPEAL from *Baltimore* county court. Debt brought on the 4th of May 1818, in the name of the State, at the instance of *T. Harris*, and for the use of *J. Murray*, on the bond executed on the 23d of November 1811, by *William Merryman*, as sheriff of *Baltimore* county, with *Caleb* and *John Merryman* as his sureties. The bond was in due form, and was approved by the orphans court of the county on the day of its date. The defendants below, (now appellants,) pleaded *general performance*, to which the plaintiff, protesting a *nonperformance*, replied, that in March 1811, the state, at the instance and for the use of *T. Harris*, administrator of *J. Gwinn*, (being the *T. Harris* at whose instance this suit was brought,) recovered a judgment against *T. Bailey* for the sum of £10,000 current money debt, and $7 60 costs, to be released on payment of £897 6 10, with interest from the 18th of December 1807, and costs. That upon this judgment a writ of *fieri facias* issued on the 2d of November 1811, and was directed to, and delivered to said *W. Merryman*, he then being sheriff of said county, to be executed, who laid said writ on certain real property of said *Bailey*, and returned said writ to court, endorsed, that the property remained in his hands unsold for want of buyers. That on the 18th of July 1812, a writ of *venditioni exponas* issued, also directed

H having a judgment against, and M his surety, sues process thereon, the sheriff makes the amount of the judgment, but only pays a part of it to H, and the balance is paid H by M the surety, they (H & M) not knowing that there were funds in the hands of the sheriff—*Held*, that M's payment does not discharge the sheriff, but that H's claim against the same operates as an equitable assignment of such claim to M, for which he may sue the sheriff's bond. The act of limitations, if relied on, must be pleaded, *(note.)*